# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| SAMUEL ROSARIO BELTRÁN, his wife ANA H. COIRA SALGADO and the Conjugal Partnership constituted between them; THE ESTATE OF CARLOS LICO ROSARIO BELTRÁN, comprised by its heirs CARLA MICHELLE ROSARIO PÉREZ, CARLOS MANUEL ROSARIO PÉREZ and MANUEL ALFREDO ROSARIO PÉREZ, | Civil No. |
| Plaintiffs | |
| v. | JURY TRIAL REQUESTED |
| UNITED STATES OF AMERICA (Agency: United States Coast Guard), | |
| Defendant | |

## COMPLAINT

TO THE HONORABLE COURT:

COME NOW plaintiffs SAMUEL ROSARIO BELTRÁN, his wife ANA H. COIRA SALGADO and the Conjugal Partnership constituted between them; THE ESTATE OF CARLOS LICO ROSARIO BELTRÁN, comprised by its heirs CARLA MICHELLE ROSARIO PÉREZ, CARLOS MANUEL ROSARIO PÉREZ and MANUEL ALFREDO ROSARIO PÉREZ, through their undersigned attorneys and respectfully state and pray as follows:

## I.    INTRODUCTION

1.1    Plaintiffs bring this action against Defendant United States of America to recover damages for the injuries and wrongful death suffered as a result of the United

States Coast Guard's agents and employees negligence that resulted in a collision between the CGC WINSLOW GRIESSER, a Sentinel Class 154-foot Fast Response Cutter, with the DESAKATA, a 23 foot in-length center console vessel, on August 8, 2022, approximately four (4) nautical miles north of Dorado, Puerto Rico.

1.2     As a direct result of said collision, Mr. Carlos Lico Rosario Beltrán died and Mr. Samuel Rosario Beltrán suffered significant physical and emotional damages.

## II.     JURISDICTION

2.1     Subject matter jurisdiction lies in this Court under 28 U.S.C. § 1333 and the Public Vessels Act, 46 U.S.C. §§ 31101 *et seq.*

2.2     In the alternative, should the Court conclude that, Suits in Admiralty Act (SAA), 46 U.S.C. §§ 30901 *et seq.* or the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680, applies, the Court has subject matter jurisdiction pursuant to those Acts as well.

## III.     VENUE AND CLAIM PREREQUISITE

3.1     Venue is proper in the District of Puerto Rico because this district is where Plaintiffs reside and where the events or omissions giving rise to the claim occurred. 28 U.S.C. § 1391(b); 46 U.S.C. § 30906.

3.2     While neither the Suits in Public Vessels Act, 46 U.S.C. §§ 31101 et. seq., nor in the Admiralty Act, 46 U.S.C. §§30901 et seq., expressly require Plaintiffs to provide administrative notice to the United States Coast Guard, Plaintiffs presented an administrative claim to the United States Coast Guard. In abundance of caution, on September 8, 2023. Plaintiffs submitted, via certified mail, notice of their claims against the United States Coast Guard under the facts addressed below, using Standard Form

95. A true and correct copy of Plaintiffs' letter, which includes the Standard Form 95 administrative claim form, is attached to this Complaint and marked as "Exhibit A." A copy of the Coast Guard's written *de facto* denial of Plaintiffs' claims is attached to this Complaint and marked as "Exhibit B."

## IV.    PARTIES

4.1    Plaintiff, Samuel Beltrán Rosario, is of legal age, married to co-plaintiff Ana H. Coira Salgado, licensed Commercial Fisherman and resident of Vega Alta, Puerto Rico.

4.2    Ana H. Coira Salgado is of legal age, married to co-plaintiff Samuel Rosario Beltrán, employee and resident of Vega Alta, Puerto Rico.

4.3    Carla Michelle Rosario Pérez, Carlos Manuel Rosario Pérez and Manuel Alfredo Rosario Pérez are all of legal age, residents of Vega Alta, Puerto Rico and only heirs of Carlos Lico Rosario Beltrán, who was killed in the collision subject of this litigation.

4.4    The United States Coast Guard is an agency of the United States Department of Homeland Security, and thus, is an agency of the United States of America.

4.5    The officers and agents of the Coast Guard mentioned herein are all agents of the United States Department of Homeland Security.

## V.    FACTS

5.1    On August 8, 2022 Plaintiff, Samuel Rosario Beltrán, was on board and the Operator of the *Desakata*, a 1977 23 foot in-length Robalo Center Console (See Figure 1), along with crew member and brother, Carlos Lico Rosario Beltrán, while

transiting northbound, trolling and doing commercial fishing at approximately four (4) nautical miles north of Dorado, Puerto Rico. Samuel Rosario Beltrán was the owner of the boat.



Figure 1 Center-console boat *Desakata* before the collision. Source: NTSB Report 7-03-2023.See *https://www.ntsb.gov/investigations/AccidentReports/Reports/MIR2314.pdf*

5.2    At all times material, the *Desakata* was, previous to the collision hereinafter described, tight, staunch, strong and seaworthy, and properly manned and equipped for a vessel of its size.

5.3    The CGC *Winslow Griesser*, a Sentinel Class **154-foot** Fast Response Cutter (See Figure 2), was identified to support an operation whereby two Dominican Republic Navy Shipriders would embark on a U.S. Coast Guard asset on August 8, 2022 at **1600** in Punta Cana, Dominican Republic. The transit distance from San Juan, PR to Punta Cana, DR is approximately 150 nautical miles.

4



Figure 2. US Coast Guard cutter *Winslow Griesser*. Id.

5.4    At all relevant times Lt. Cmdr. Benjamin Williamsz was the Commanding Officer (C.O.) of the CGC *Winslow Griesser*.

5.5    The CGC *Winslow Griesser* was scheduled to get underway from Coast Guard Base San Juan, Puerto Rico at **0830** on August 8, 2022 but the trip was delayed due to a loss of pressure in the propulsion engine-cooling seawater system. The cutter finally got underway on a westerly course at approximately **1305**, and after clearing the shoal water, on the west side of the San Juan Harbor approach, the bridge team altered the cutter's course to a northwesterly direction and increased speed from 15 to **29 knots**. At **1406**, the bridge team again altered the cutter's course to port, closer to a westerly course. The ***Winslow Griesser* was running behind schedule.**

5.6    On that same day, the center-console boat *Desakata* left Cerro Gordo, Vega Alta, Puerto Rico about **0930** and headed northeasterly toward a fish aggregating device (FAD) buoy 7.4 miles north of the coastline (See Figure 3). After departing Cerro Gordo, following the coast, then turning north, the *Desakata* slowly proceeded north while trolling for fish with four lines in the water.

5



Figure 3. Area where the *Winslow Griesser* and *Desakata* collided, as indicated by a red X. The *Desakata*'s trackline is approximate. Id.

5.7    Co-plaintiff Samuel Rosario Beltrán operated the *Desakata* from the center console as the boat headed toward the FAD buoy, making about 5 knots with the seas on the starboard beam. The coastal weather forecast issued at **1106** called for 15- to 20-knot easterly winds and 4 to 6-foot seas.

5.8    At approximately **1417** on said day the CGC *Winslow Griesser* collided with the *Desakata (See Figure 3 above)*, approximately four nautical miles north of Dorado, Puerto Rico. As a direct result of said collision Mr. Carlos Lico Rosario Beltrán was fatally injured and Mr. Samuel Rosario Beltrán was seriously injured. The *Desakata*, valued at $58,800.00, was a total loss. (See Figure 4).



Figure 4. The Desakata's bow section adrift immediately after the collision. Id.

5.9    The CGC *Winslow Griesser* failed to maintain a proper lookout as required by Rule 5 of the Convention on the International Regulations for Preventing Collisions at Sea, 1972 COLREGs / USCG Navigation Rules, 33 CFR § 83.05, that would have enabled the cutter crew, under the existing conditions, to visually see the *Desakata* in time to avoid collision.

5.10    Said Rule 5 states that "[e]very vessel shall at all times maintain a proper look-out by sight and hearing as well as **by all available means** appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision."

5.11    The *Winslow Griesser* was outfitted with two radars, a Vega electronic chart display and information system (ECDIS), and a Global Maritime Distress and Safety System (GMDSS) console, among other Coast Guard-specific equipment. On the bridge forward console, from port to starboard, was a Furuno DRS4A radar display and a SeaWatch station in front of the captain's chair; another SeaWatch station and

7

the helm station in front of the helmsman's chair; a vessel management system (VMS)

console; and a Furuno AN/SPS-50 radar (See Figures 4 and 5).



Figure 4. *Winslow Griesser* bridge, looking forward and to port. Id.



Figure 5. *Winslow Griesser* bridge arrangement and approximate location of individuals at the time of the collision. Id.

5.12   Bridge watches aboard the *Winslow Griesser* during normal at-sea

operations consisted of an officer of the deck and a quartermaster of the watch. The

officer of the deck was responsible for navigating the vessel, including steering, monitoring traffic, and using electronic navigation tools such as radar and the electronic chart display and information systems (ECDIS). The quartermaster of the watch maintained the navigation plot, logs, and weather reports and also acted as a lookout. Aboard *Winslow Griesser*, no person was designated solely as a lookout with no other duties. According to one of the cutter's qualified quartermasters of the watch, at least one watchstander, by practice, was to keep an eye forward for hazards at all times. In the *Winslow Griesser* "the lookout is mainly everybody's job." Although the *Winslow Griesser* commanding officer's *Standing Orders to the Officer of the Deck* contained expectations and responsibilities for the "officer of the deck and all other bridge watchstanders when the cutter was not in port, they did not specifically mention lookout duties. NTSB Report MIR-23-14, at pages 15-16.

5.13 Aboard the *Winslow Griesser*, the bridge watch consisted of a quartermaster of the watch and an officer of the deck. **No other bridge watch member was designated solely as a lookout with no other duties**; Coast Guard practice was that all members of the bridge watch are responsible for shared lookout duties. However, Coast Guard directives do not explicitly provide guidance on what constitutes a proper lookout. Locally, the *Winslow Griesser* commanding officer's Navigation Standards and Standing Orders to the Officer of the Deck did not have a robust section on the importance and criteria for what constitutes a proper lookout. Id. at page 27.

5.14 Although only two were formally on watch, five people were on the bridge (the other personnel included the cutter's commanding officer, the training petty officer, and a visiting port engineer). **The commanding officer at one point in the minutes**

leading up to the collision was engaged in either voyage planning or other administrative tasks at the forward console. The training petty officer was training to qualify as quartermaster of the watch and was new to the vessel. He was the last to arrive on the bridge and was waiting to start his training with the quartermaster of the watch. **The quartermaster of the watch was at an aft console attending to administrative duties.** From his location in the aft part of the bridge, and **because he was engaged in other tasks, he was not looking out.** With the quartermaster of the watch occupied, the officer of the deck was left to keep a lookout. At the forward console, **the officer of the deck and port engineer were reviewing and discussing the operation of various equipment at the helm station.** Id. at page 27.

5.15    Standing on the bridge of the cutter, the officer of the deck's height of eye would have been about 19.5 feet above the vessel's waterline. From this height of eye, the horizon on a clear day, independent of sea state, weather conditions, and structural obstructions to visibility, would be about **5 miles away,** and **the cutter crewmembers should have been able to see the entire 2.5-foot-high *Deskata* hull (without considering the canopy) at this distance.** At a speed of **29 knots,** the cutter would travel 5 miles in about 9 minutes. In combined seas of 6 feet, the fishing vessel may have been only intermittently visible. The fishing vessel's white canopy, about 9 feet above the water, could have been confused for a whitecap in the seas. However, there was a reasonable chance that the bridge watchstanders could have visually sighted the *Desakata* if they were constantly scanning the water for contacts. Therefore, **the NTSB concluded that the *Desakata* should have been visible to the *Winslow Griesser***

**crewmembers before the collision, but the bridge watchstanders were not maintaining a proper lookout**. Id. at page 27.

5.16    The cutter's Navigation Standards instructed officers of the deck to use the centerline SeaWatch station as an Electronic Chart Display and Information System (ECDIS). Both radars (see Figure 4) were used for collision avoidance. However, bridge watchstanders did not routinely use the radar overlay on the SeaWatch.    Id. at page 16. Furthermore, the cutter's *Navigation Standards*, regarding safe speed, stated: "**[Officers of the deck] shall take measures to increase situational awareness when transiting at high speeds, or if circumstances dictate, reduce speed in accordance with COLREGS**." Id. at page 27.

5.17    Planned speed of advance must balance a multitude of factors. The ideal speed is one that balances fuel consumption and crew comfort while ensuring maximum on-scene time and operational relevance.    **Typical transit speeds will be between 15–20 knots**.    Id. at page 16. The *Winslow Griesser* exceeded such speed.

5.18    The cutter's 29-knot speed warranted extra vigilance by the bridge watch. To increase situational awareness, the commanding officer or officer of the deck **could have halted the training taking place** between the officer of the deck and the visiting port engineer **or required the on-watch quartermaster of the watch to perform lookout duties. They also could have slowed the cutter's speed**.    At a minimum, the officer of the deck and quartermaster of the watch should have communicated to ensure that while one was occupied with other tasks, the other was looking forward.

**They took none of these actions**. Therefore, the NTSB concluded that "the Winslow Griesser **commanding officer and officer of the deck did not take sufficient measures to increase their situational awareness when the cutter was transiting at high speed**." Id. at pages 27-28.

5.19   The commanding officer, port engineer, and officer of the deck were standing at the forward part of the bridge near the radars helm, SeaWatch, and VMS consoles.   The quartermaster of the watch was sitting at a standard workstation near the after part of the bridge on the port side.   The training petty officer near the chart table on the middle starboard area of the bridge.   A crewmember on break was standing outside, immediately AFT of the bridge.

5.20   Both SeaWatch consoles could display either the Vega ECDIS software for navigation or a secure internet protocol router net (SIPR) chat window to communicate with other law enforcement units and with shoreside command and control. The monitors could also display stand-alone automatic radar plotting aid (ARPA) data fed from the AN/SPS-50.

5.21   The *Winslow Griesser* was equipped with an Automatic Identification System (AIS), which consisted of a receiver and a very high frequency (VHF) transponder that transmitted the vessel's identity, position, course, speed, size, and destination. According to the cutter's *Navigation Standards*, which the commanding officer issued to promulgate unit navigation standards and watchstanding procedures for the safe navigation of *Winslow Griesser* and its small boat, the *Winslow Griesser*'s

AIS transmitter was normally secured when the cutter was operating outside of restricted waters.

5.22   On the other hand, the *Desakata* vessel was not equipped with such sophisticated navigational instruments to avoid or prevent collision, as opposed to the CGC *Winslow Griesser*.  The *Desakata* was equipped with a fathometer, GPS, and VHF radios only.

5.23   The CGC *Winslow Griesser* failed to maintain a safe speed as required under Rule 6, 33 CFR § 83.06, that would have enabled the cutter crew, under the conditions, to take necessary actions to avoid collision.

5.24   Rule 6, Id., states:

"Every vessel shall at all times proceed at a safe speed so that she can take proper and effective action to avoid collision and be stopped within a distance appropriate to the prevailing circumstances and conditions. In determining a safe speed the following factors shall be among those taken into account:

(a) By all vessels:

        (i) The state of visibility;
        (ii) The traffic density including concentration of fishing vessels or any other vessels;
        (iii) The maneuverability of the vessel with special reference to stopping distance and turning ability in the prevailing conditions;
        (iv) At night, the presence of background light such as from shore lights or from back scatter of her own lights;
        (v) The state of wind, sea, and current, and the proximity of navigational hazards;
        (vi) The draft in relation to the available depth of water.

(b) Additionally, by vessels with operational radar:

        (i) The characteristics, efficiency and limitations of the radar equipment;
        (ii) Any constraints imposed by the radar range scale in use;
        (iii) The effect on radar detection of the sea state, weather, and other sources of interference;
        (iv) The possibility that small vessels, ice and other floating objects may not be detected by radar at an adequate range;

(v) The number, location, and movement of vessels detected by radar;
(vi) The more exact assessment of the visibility that may be possible when radar is used to determine the range of vessels or other objects in the vicinity."

5.25    The CGC *Winslow Griesser* commanding officer and officer of the deck did not take sufficient measures to increase their situational awareness when the cutter was transiting **at high speed**.

5.26    Regardless of which of the two vessels was the give way vessel in a crossing situation, the cutter's failure to maintain proper lookout and to maintain safe speed prevented critical actions by the cutter crew that ultimately could have avoided the collision or minimized its consequences.

5.27    The public rightly expects the Coast Guard, as professional mariners, maintain and emulate the highest standards of prudent seamanship and navigation. They did not do so here with tragic consequences for members of the public they serve.

5.28    Coast Guard *Winslow Griesser*'s failure to keep a proper lookout and to maintain a safe speed, in violation of the Navigation Rules was the proximate cause of the collision with the *Deskata*, causing the death and serious physical injuries to the Rosario brothers.

5.29    The aforesaid collision which resulted in the wrongful death of Carlos Lico Rosario Beltrán, serious physical and mental injuries to Samuel Rosario Beltrán and total loss of the *Desakata* was not caused, or contributed to, by any fault or negligence on the part of plaintiffs, the *Desakata*, or of the persons in charge of her, or of any person for whom the plaintiffs were responsible, but was caused solely by and due wholly to the fault and negligence of the *Winslow Griesser* and the persons in charge of her navigation who were the servants and employees of defendant.

14

5.30    As a result of the negligence of the Coast Guard personnel, co-plaintiff Samuel Rosario Beltrán, once his vessel was hit and destroyed by the *Winslow Griesser,* found himself submerged in the sea waters fighting and struggling for his life. Once he was able to regain control and emerged his head above water, he began to look out shouting for his brother Carlos Lico. As soon as he devised him, he swam towards him and was able to grab his brother. He noticed that Carlos Lico was bleeding profusely, some of his internal organs were out visibly, and part of his left leg was missing. He kept afloat holding his brother and waiving towards de *Winslow Griesser* to turn around and rescue them.

5.31    Once the *Winslow Griesser* was able to return, the crew maneuvered the cutter alongside and deployed liferings and a *Jabob's ladder* while they prepared to launch the small boat and a rescue swimmer. Co-plaintiff Samuel Rosario Beltrán was instructed by a *Winslow Griesser's* lady crewmember to let go his brother, to climb the ladder and that they would get his brother out later. Samuel refused and told the crewmember that he would not let his brother alone at sea.

5.32    The *Winslow Griesser* then turned the boat around and threw a small raft. Samuel swam to the raft holding his brother Carlos Lico. The crew again told Samuel that they would lift him first and he again refused and replied that they must lift his brother first. They did that and afterwards lifted Samuel to the cutter. At that point in time Carlos Lico was dead.

5.33    Once both plaintiffs were lifted to the *Winslow Griesser*, the Coast Guard Sector San Juan diverted a 45-foot response boat and a 33-foot special purpose craft to the collision scene. At 1440 the *Winslow Griesser* departed the scene en route to San

Juan and moored at Charlie South Pier at Sector San Juan at 1550, where emergency medical services met the vessel. Samuel was transported to the Emergency Department at Centro Médico in San Juan, where he was treated and released the next day.

5.34    Samuel Rosario Beltrán was diagnosed and treated for the following conditions: (i) scalp abrasion, (ii) scalp hematoma, and (iii) lumbar transverse process fracture.

5.35    Samuel Rosario Beltrán required psychiatric treatment from APS Clinics and was diagnosed with (i) Major depressive disorder, (ii) Disappearance and death of family member, and (iii) Post-traumatic stress disorder, chronic.

5.36    Additionally, Samuel Rosario Beltrán suffered physical pain and suffering, mental anguish, reasonable fear of developing future physical and medical problems loss of enjoyment of life, physical disability, impairment, inconvenience on the normal pursuits and pleasures of life, feelings of economic insecurity caused by disability, disfigurement, aggravation of any previous existing conditions therefrom, incurred medical expenses in the care of treatment of injuries, suffered physical handicap. Lost wages, income lost in the past, and his working ability and earnings capacity has been impaired. The injuries and damages are permanent or continuing in nature, and plaintiff will suffer the losses and impairments in the future.

5.37    As a result of the negligence of the Coast Guard personnel Carlos Lico Rosario Beltrán suffered a wrongful death. Before his tragic and traumatic demise, Carlos Lico suffered pain and moral anguishes, which cause of action is transmittable to his heirs.

5.38    Carlos Lico Rosario Beltrán suffered the following physical conditions which caused his death:

    (i).    Posterior dislocation/separation of the thoracic and lumbar spine at T6 and L1;

    (ii).    Separation and dislocation of the left hemipelvis;

    (iii).    Severe left lower abdominal and left anterior hip soft tissue injury with marketed deep soft Tissue loss beyond the myofascial layer exposing muscle, bone, and bowel. Bowel and intra-abdominal contents herniate anteriorly and posteriorly through deep soft tissue defects in the left lateral abdominal and pelvic wall into the adjacent soft tissue;

    (iv).    Extensive intraabdominal and thoracic visceral soft tissue injury;

    (v).    Marketed pneumoperitoneum with large open defect in the anterolateral abdominal wall;

    (vi).    Suspected bilateral diaphragm rupture with herniation of abdominal contents into the thoracic cavity;

    (vii).    Bilateral pneumothoraxes with left-ward shift of the heart;

    (viii).    Right SI diastasis with fracture of the right lilium. Multiple additional pelvic fractures;

    (ix).    Portions of the left coccyx are not well demonstrated and are favored to likely be fractured and displaced anteriorly and inferiorly:

    (x).    Numerus sequential and segmental rib fractures with separation of the anterior chest wall;

    (xi).    Comminuted right scapula and acromion fractures with posterior dislocation of the shoulder;

    (xii).    Comminuted and displaced right proximal femur shaft fracture;

    (xiii).    External rotation of the distal right femur; and

    (xiv).    Abnormal morphology of the maxillary incisors and premolars, possibly post-traumatic.

5.39    As a direct result of the negligent operation of the CGC *Winslow Griesser* that caused the collision with the *Desakata*, Lt. Cmdr. Williamsz was first administratively reassigned duty following the collision on August 8, 2022, and soon thereafter, **relieved of duties as the Commanding Officer due to a loss of confidence in Williamsz's ability to effectively command the cutter**.

## VI.    COUNT I - NEGLIGENCE AGAINST THE UNITES STATES UNDER THE PUBLIC VESSELS ACT, §§ 3101-3113

6.1    Plaintiffs re-allege, adopt and incorporate by reference the allegations in paragraphs 1.1 thru 5.39 as though alleged originally herein.

6.2    The Public Vessels Act ("PVA"), allows plaintiffs to bring claims for damages caused directly by public vessels. 46 U.S.C. § 31102(a) (allowing "civil action[s] *in personam* in admiralty" against the United States for "damages caused by a public vessel of the United States"); see *Uralde v. United States*, 614 F.3d 1282, 1286 (11th Cir. 2010) ("Claims seeking relief for damages caused directly by a public vessel, or by the negligent operation thereof, fall under the PVA. The SAA covers all remaining admiralty claims, including those simply involving public vessels.")

6.3    The PVA was enacted after the Suits in Admiralty Act. The PVA allows an action to be brought against the United States for damages caused by public vessels. Under 46 U.S.C. § 31102 (a)(1) the United States has waived sovereign immunity, allowing *in personam* civil actions in admiralty against the United States for damages caused by a public vessel of the United States. The PVA has been expanded to include damages caused by the negligence of the crew of a public vessel. *Canadian Aviator v. United States*, 324 U.S. 215 (1945). Accordingly, the United States is liable under the PVA for negligence of a public vessel and its crew in a collision resulting in injury, death

18

and harm.

6.4     In this case, the United States Coast Guard vessel, the CGC *Winslow Griesser,* is a public vessel of the United States. Moreover, on August 8, 2022 the United States Coast Guard crew negligently, and in violation of USCG Navigation Rules 5 and 6, failed to keep a proper lookout and to maintain a safe speed causing a fatal collision with the *Desakata* vessel and causing the wrongful death of crewmember Carlos Lico Rosario Beltrán and severe and permanent injuries on Samuel Rosario Beltrán.

6.5     At all times material, the United States Coast Guard personnel involved in the incident described above, including the United States Coast Guard officers, agents, employees and the crew of the vessel CGC *Winslow Griesser* on August 8, 2022, were acting within the course and scope of their employment and agency.

6.6     At all times material, the United States Coast Guard's clear negligence and failure to adhere to basic maritime rules proximately caused the collision and, therefore, the plaintiffs' injuries and death.

## VII.    COUNT II – NEGLIGENCE AGAINST THE UNITED STATES UNDER THE SUITS IN ADMIRALTY ACT, §§ 30901-30913

7.0     Plaintiffs re-allege, adopt and incorporate by reference the allegations in paragraphs 1.1 thru 5.39 as though alleged originally herein.

7.1     This cause of action is brought under the Suits in Admiralty Act §§ 30901-30913 ("SAA"). Under the SSA, the United States of America waived sovereign immunity for admiralty claims *in personam* against the United Sates arising out of incidents involving United States' merchant vessels. In particular, the claims involve the negligent operation of a United States Coast Guard vessel, which caused injury and

wrongful death to plaintiffs (private persons) upon navigable waters.

7.2     At all times material, the United States Coast Guard personnel involved in the incident described above, including the United States Coast Guard officers, agents, employees and the crew of the vessel CGC *Winslow Griesser* on August 8, 2022, were acting within the course and scope of their employment and agency.

7.3     Plaintiffs re-alleges, adopt and incorporates by reference the allegations in paragraphs 5.1 thru 5.39 as though alleged originally herein.

7.4     At all times material, the United States Coast Guard's clear negligence and failure to adhere to basic maritime rules proximately caused the collision and, therefore, the plaintiffs' injuries and death.

## VIII.    COUNT III – NEGLIGENCE AGAINST THE UNITED STATES UNDER THE FEDERAL TORTS CLAIM ACT, 28 U.S.C. §§ 2671-2680

8.1     Plaintiffs re-allege, adopt and incorporate by reference the allegations in paragraphs 1.1 thru 5.39 as though alleged originally herein.

8.2     This count is plead only to the extent that the Suits in Admiralty and the Public Vessels Act are inapplicable. Plaintiffs, alternatively, plead this action under the Federal Torts Claim Act, 28 U.S.C. §§ 2671-2680.

8.3     Under the FTCA, 28 U.S.C. §§ 2671-2680, individuals who are injured or whose property is damaged by the wrongful or negligent act of a federal employee acting within his or her official duties may file a claim with the government for reimbursement for that injury or damage.

8.4     At all times material, the United States Coast Guard personnel involved in the incident described above, including the United States Coast Guard officers, agents, employees and the crew of the vessel CGC *Winslow Griesser* on August 8, 2022, were

acting within the course and scope of their employment and agency.

8.5     Plaintiffs re-allege, adopt and incorporate by reference the allegations in paragraphs 5.1 thru 5.39 as though alleged originally herein.

8.6     At all times material, the United States Coast Guard's clear negligence and failure to adhere to basic maritime rules proximately caused the collision and, therefore, the plaintiffs' injuries and death.

## IX.     DAMAGES

### Co-Plaintiff Samuel Rosario Beltrán

9.0     As a result of the collision caused directly by the Coast Guard vessel, the CGC *Winslow Griesser*, and/or the negligence of its personnel, or by the negligent operation thereof, co-plaintiff Samuel Rosario Beltrán suffered the following damages:

(i)     Pain and suffering for physical injuries:   $5,000,000.00;

(ii)     Pain and suffering for emotional, moral anguish and psychiatric conditions: $5,000,000.00;

(iii)     Total loss of vessel *Desakata*: $58,800.00;

(iv)     Loss of income: $331,200.00

### Co-Plaintiff Carlos Lico Rosario Beltrán and his Estate

10.0     As a result of the collision caused directly by the Coast Guard vessel, the CGC *Winslow Griesser*, and/or the negligence of its personnel, or by the negligent operation thereof, co-plaintiff Carlos Lico Rosario Beltrán and his Estate suffered the following damages:

(i)     Pain and suffering for physical injuries and wrongful death: $10,000,000.00;

(ii)    Pain and suffering for emotional, moral and mental anguish: $5,000,000.00;

(iii)   Loss of income: $211,000.00


**WHEREFORE**, plaintiffs demand all damages entitled by law and demands jury trial of all issues so triable.

RESPECTFULLY SUBMITTED.

In San Juan, Puerto Rico, this 19th day of July 2024.


**JUAN B. SOTO LAW OFFICES, P.S.C.**
1353 Ave. Luis Vigoreaux
PMB 270
Guaynabo, PR 00966
Tel. (787) 273-0611

**s/JUAN B. SOTO BALBÁS**
USDC-PR-130305

Cel. (787) 370-6197
E-mail: jsotobalbas@gmail.com

**s/CARLOS F. LÓPEZ**
USDC 126514
Cel. 787-501-4150
 E-Mail: charlielopez@gmail.com
    cflopezlaw@gmail.com

**s/FRANCISCO J. AMUNDARAY**
USDC-PR-208706

Cel. 787-486-4717
E-Mail: fjamundaray@gmail.com;
    fjamundaray@amundarayvillareslaw.com